**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MONTANA**

**BILLINGS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. CV-11-141-BLG-RFC** |
| **Plaintiff,** | |
| **vs.** | **ORDER FINDING DEFENDANT GUILTY OF COUNT I** |
| **RICKY ALLEN DENNIS** | |
| **Defendant.** | |

**I.** **INTRODUCTION**

Defendant Ricky Allen Dennis was named in CR-11-141-BLG-RFC in a

four-count Indictment charging: conspiracy to commit robbery affecting

commerce, in violation of 18 U.S.C. § 1951(a), the Hobbs Act, Count I; felon in

possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), Counts II and III;

and receipt of a firearm while under information for felony crime, in violation of

18 U.S.C. § 922(n), Count IV.  Dennis was also previously indicted in CR-11-101-

BLG-RFC with two counts of being a felon in possession of firearms, also in violation of 18 U.S.C. § 922(g)(1).

On October 10, 2012, Dennis pleaded guilty to Counts II, III, and IV in CR-11-141 and both Counts I and II in CR-11-101. That leaves only Count I of CR-11-141, alleging conspiring to commit robbery affecting commerce, for disposition.  Dennis maintains he cannot be guilty of the charge because he was incarcerated at the time the alleged robbery was to have occurred and because there is an insufficient connection to interstate commerce. Because the underlying facts are not in dispute, the parties have agreed to a bench trial on stipulated facts on the robbery charge.

On January 30, 2013, the parties submitted a joint statement of stipulated facts (doc. 30), followed one day later by briefs in support of their respective positions (docs. 31 & 32). After a thorough review of the parties' filings and the applicable law, the Court concludes Dennis is guilty beyond a reasonable doubt of conspiracy to commit robbery affecting commerce as charged in Count I of the Indictment in CR-11-141-BLG-RFC.

## II. FINDINGS OF FACT

The following facts are taken verbatim from the Joint Proposed Findings of Fact (doc. 30):

1. In early 2011, defendant Ricky Allen Dennis met ATF Agent Daniel Forster acting in an undercover capacity. Forster, as part of his undercover operation, purported to own and operate a tattoo parlor in Billings, Montana.

2. Over the ensuing weeks, Dennis spent time at Forster's tattoo parlor and offered his services as "muscle" in case Forster needed assistance in his sideline business of trafficking in guns and drugs. Dennis brought along his NCIC criminal history printout and gave it to the undercover agents, noting that it showed his "character" and emphasized crimes such as assaulting a peace officer. Dennis was armed during that meeting and showed the undercover agents a Hi-point pistol.

3. On November 6, 2011, Forster called Dennis to report that he had a job for him the next day, and that Dennis needed to bring himself and two additional people. Dennis reported he would be bringing along "Choo" (Edwin Johnson) and "Jesse" (Jesse James Elkins) to assist. Forster told Dennis that he had "something big" coming up and was looking for the right group of people to help him out. Dennis told Forster that he had three additional people on stand-by if they were needed. Forster told Dennis that everyone should come prepared for the deal the next day and that he had something coming up at the end of the month.

4. On November 7, 2011, Dennis and Forster spoke, and Forster reported that they were "a go" for the deal that afternoon; Dennis replied that he, Johnson

and Elkins could be ready in 15 minutes. The conversations took place on Johnson's phone. Dennis, Johnson and Elkins met with Forster and another ATF Special Agent at the tattoo parlor. The agents explained that Dennis, Johnson and Elkins were to provide security for the transaction between the agents and someone with whom they were doing business, trading one case of untaxed cigarettes for firearms. The other individuals were actually other undercover agents acting as criminals. Dennis was armed with a Hi-Point, .45 caliber pistol during the transaction, and showed it to Forster. Johnson was armed with a small silver colored semi-automatic pistol in the front waistband of his pants, while Elkins was not armed. Dennis asked Special Agent Forster how he wanted the transaction handled and whether Forster wanted them to "go serious" on the gun sellers. Forster explained that he wanted the same thing that Dennis had done in the past, which was to simply provide protection to Forster by maintaining a presence in an effort to intimidate the sellers. Dennis had done so before in another undercover deal with guns involving another DCI agent. Forster also told the three that they had a more serious plan in the works they needed help with. Forster explained that "one of his boys" is a drug courier for "La Familia gang" who was looking to put together a crew to conduct a home invasion robbery to steal a shipment of "white" or cocaine. Forster told the group that his "boy" moves

"large birds" or several kilograms of cocaine for La Familia and that he was angry at the gang and wanted to "jack a load" or steal a shipment in retribution. Forster explained that the cocaine is brought to Billings, where it never hits the street, is split up and heads east for further distribution. Forster explained that his "boy" wanted Forster to put together a crew to conduct the robbery, discussing how dangerous it was as the stash of cocaine was going to be guarded by individuals with guns.

5. Dennis immediately replied "I'm already good, bro" and "I just tell you up front, bro, I'm not leaving' no witnesses bro; nobody that can go back to their family and say 'hey I saw such and such,' bro, honestly. If we're talking serious weight. No witnesses, no case, bro." Forster explained that the drugs would be divided up among those participating in the robbery, and that he knew there was going to be a "serious" amount of drugs there, but unsure as to whether there would be any money. Forster said that only people who were serious about carrying out the robbery should be there, and Dennis responded that he would bring with him some "niggers with crooked eyes." Forster asked Elkins if he was down with it, and Elkins responded that "that's my man right there," referring to Dennis while nodding his head. When asked if Elkins had ever done anything like that before, Johnson and Dennis laughed and replied that Elkins "likes to put

buckshot in a .22 and walk in a room… bop, bop, bop" (making a shooting motion with his hand.) Dennis told Forster that his big brother "Cowboy" would be coming and that "we not playin' no games."

6. Forster told Dennis that he needed to stay in contact and Dennis needed to get a phone. Forster told Dennis that he could add him on his cell phone plan, and they would go get Dennis a phone as part of his compensation for helping Forster with the deal. Dennis reported that he couldn't then as he had to deliver a quarter pound of "green" (marijuana). Dennis told Forster that he was on release on a $100,000 bond in the state system on a robbery charge. Forster told them they needed to be careful as another person they had lined up for the job had been killed by police recently in Red Lodge and another person arrested in Las Vegas. Forster told the three to keep the discussion between themselves and that his "boy" would likely be in town the following week to talk more about the robbery. Dennis asked if Forster could provide Dennis and the crew some firearms to use in the robbery, but Forster said he would have to think about it. Dennis suggested that Forster could give them the guns prior to the robbery and they would give them back after the robbery was done. Forster said he would think about it, but that for now, Dennis and his crew should look to find the firearms they wanted on their own. Dennis, Johnson and Elkins then stood by as security while the gun deal was

concluded. Forster and one of the agents had a conversation about future deals, while Dennis, Johnson and Elkins stayed in the garage keeping an eye on the other two undercover agents. When the deal was done and the other agents left, Forster gave Dennis, Johnson and Elkins each a couple packs of cigarettes and $100 each for their services. Forster also agreed to provide Dennis a new cell phone and Dennis and Forster made arrangements to meet the following day to acquire the phone. Dennis, Johnson and Elkins then left.

7. On November 8, Forster and Dennis met at a cell phone store where Forster purchased the phone for Dennis and added him to his plan. Before the transaction was complete, Dennis had to leave. When the transaction was complete, Forster had Dennis meet him at a parking lot to give him the phone. Dennis report that he was armed during the meet. Dennis told Forster that he had spoken with "Ant" (Anthony Roll) and that Roll wanted to be in on the deal but that Dennis did not have time to "babysit the whole gun thing," as Roll did not always have a gun. Forster told Dennis that his "boy" wanted two crews lined up for the robbery, would meet with them, and then pick one for the robbery. Dennis told Forster that his "boy" "will get sold on my team, I already know, I'm not concerned with it." Forster said that he expected the meet to occur on November 16, and that he would want to meet with Dennis and his crew at that time. Dennis

offered to put together two crews and let his "boy" choose between them; Forster told Dennis to just get one crew together and get them ready to work.

8. On November 8, Forster spoke with Dennis who complained about how poorly his new cell phone worked, and the two agreed to meet up to exchange it for a new phone. Forster asked Dennis if he had been able to come up with a crew for the robbery and Dennis reported that he had four people including himself, that it would be Dennis, Johnson, Elkins and Dennis's older brother "Cowboy," noting that they were ready for business whenever Forster was. Forster suggested he consider including Roll on his crew and Dennis reported that he had considered that but wanted to check with Forster first.

9. On November 10, Forster spoke with Dennis several times to set up the meeting to get the new phone and the two met at the store and got a new phone for Dennis to use.

10. On November 13, Forster called Dennis, who reported that he had recruited his nephew "69," Marcus Johnson, as part of the team. Forster reported that he knew Marcus, but that he thought Johnson was out of town. Dennis reported that he was coming back for the robbery and that Dennis, Johnson and Marcus could do the robbery with their eyes closed. Forster expressed concerns about only having three people to do the robbery, Dennis replied that he thought

they could handle it and that they were the only people he trusted. Forster asked Dennis about Elkins and Dennis replied that Elkins would not talk about the robbery out of fear of Dennis. Dennis reported that Elkins was having domestic problems and had failed to carry out a mission that Dennis had sent him on, so Elkins would not be a problem to them. Forster told Dennis that his "boy" would be in town on November 16 and wanted to meet with Dennis and his crew. Dennis reported that Marcus had bought a plane ticket just to be in town for the meeting and that if Forster's "boy" did not show up, Dennis would be upset. Dennis told Forster that his "boy" needed to convince Dennis that he was solid. Dennis told Forster that he was planning to relocate after the robbery.

11. On November 14, Forster got a call from Anthony Roll, asking for Dennis's new telephone number, as they were having some issues and he needed to speak with Dennis. Roll explained that his "girl" had gotten a call from Elkins and Dennis wanted his gun back from Elkins. Forster told Roll he would pass on the information to Dennis, and did so. Dennis said he was going to call Elkins.

12. On November 16, Roll came to the tattoo parlor unexpectedly and Forster let him in. Forster was unsure whether Roll was to be part of Dennis's crew for the robbery so he told Roll that he had some business and Roll may have to leave. Roll reported that if the business was with Dennis, Dennis was supposed

to pick him up, and that he was to be part of the robbery crew with Dennis. Dennis then called Forster by phone and told him that Roll was going to be part of his crew. Approximately ten minutes later, Edwin Johnson and another male known only as "Black" arrived and engaged in general conversation with Forster. Dennis arrived approximately ten minutes after that. Dennis told Forster that he had tried to get hold of Marcus Johnson, having called him numerous times and gone to his house, to no avail, but that he would have him ready for the robbery. The conversation in the group then turned to the robbery scenario. The second undercover agent posing as Forster's "boy," reported that he had been working for La Familia, a gang, for several years and how he was disillusioned and wanted out. He reported that his way of getting out involved ripping off a load of drugs that was to be in Billings in a few weeks. He explained that 50-70 kilograms of cocaine are delivered to a stash house, where they "cool" (ensure that law enforcement is not following the shipment) for a few days and then the drugs are distributed out to couriers such as himself for further distribution. The second agent reported that he knew the gang had done distributions in Billings before, but that he had not received drugs from the stash house in Billings before. Roll claimed that he thought he knew who the people were bringing the drugs in. The second agent reported that there are three guys who guard the drugs--one in charge of

accounting for who gets what amounts and two to act as actual guards for the drugs, and that they are both "strapped" or carrying firearms. The second agent reported that all he wanted was 10 kilograms and the rest could be split among the individuals in the robbery. The second agent said he would take care of Forster from his cut. The second agent continued to lay out the story, reporting they had been doing the same thing in Arizona but that the stash houses had been getting robbed. Dennis stated "that's what we did, all we did was hit their houses." The second agent reported that he would not know the address of the stash house until minutes before he was supposed to arrive to pick up the drugs, but that the gang would call him the week before to tell him that a shipment would be coming the following week. The second agent reported that being in Billings was just the flavor of the day, to which Dennis responded "they're not going to change their routine, they just change the town." The second agent agreed, and said he would have more details the following week, as he was unfamiliar with Billings. The second agent said that if the guards needed to be killed so be it, and Dennis said "no, I was going to tell you that, um if you're okay with that, you know, we go by 'no witnesses, no case,' period. If there ain't nobody alive to talk about it, you know, that's just… I don't need the aggravation, if you don't have a problem with it, that's where we're at." The second agent said he had no problem with that and

that it was hard to find people who are down with that. Dennis responded that "to me that's just a precaution, you have to." Roll again tried to claim that he thought he knew who the group was. The second agent asked Johnson and "Black" if they were "cool" since they had been quiet. Johnson nodded and Dennis said "they wouldn't be here if they weren't cool" and "everybody wants to do this, not only need it, we want to, 'cause this is something that; I'm tired of selling dope, tired of selling sacks, tired of hustling, I'm old." The second agent again emphasized that he wanted them to understand this was not going to be easy, but that he would know more next week and call Forster with the details. Dennis asked if the gang had any history on him or if anyone had leverage on him, to get him to roll on the crew. The second agent replied that he was clean and could stay clear of the gang. Dennis and Roll asked a few more questions about the specifics of the stash house, including the number of guys there, the kind of vehicles they drive and whether they move the stash house each time. The questions were answered, and then the meeting broke up. Forster could see Dennis, Roll, Johnson and "Black" standing in a group outside the undercover location for about five minutes before they left.

13. On November 18, Dennis called Forster to discuss selling him a gun that Dennis had. The two spoke numerous times by phone and text and arranged to meet that night. Dennis and a female arrived at the tattoo parlor and Dennis

showed Forster the gun to sell. After much conversation about the gun, Dennis told Forster that Elkins, who had once been part of the crew, was out and that Dennis "decided to go find him and make sure he understood that he was not a family member anymore." Dennis said that he had Roll pull a .40 caliber gun on him, Forster asked if Elkins was still walking, and Dennis replied, "No, not right now, nah, we broke ribs." Dennis reported how Elkins was assaulted, saying that David Johnson, Sr. had made the call and when Elkins tried to plead his innocence Dennis told him "you're wasting your breath on me, I gotta answer to someone, we all have to answer to somebody." Dennis said that he broke three of Elkins' ribs, took his car and took out his "fronts" or teeth, "so he ain't pretty no more." Dennis sold the gun to Forster and the two spoke briefly about the upcoming robbery/home invasion. As Dennis and the female left, Dennis produced a black mask from his jacket and said "this is for that special day," referring to using the mask at the upcoming robbery. Dennis reported that he and Johnson had recently "hit" a house and he had bought new shoes and other things with the money.

14. On November 23, Forster called Dennis and the two talked about the possible future robbery scenario. Forster said that the second agent wanted an update on the robbery crew that Dennis had put together, and asked if the same people were involved, and if there were any issues. Dennis asked for a layout of

the structure that the robbery was to take place in but Forster told him they did not have location details yet. Forster mentioned renting a vehicle for them and Dennis said "we need something we can slide out of," "without drawing too much attention, you know what I mean." Forster asked if Dennis would be in the same vehicle as the second agent and Dennis replied, "yeah, for it to be instantaneous." Forster asked other questions including how many people would be participating in the robbery and Dennis replied "same people so far, no one changed, but I liked to add two more" but that he would have to talk to them that night. Forster asked about "Black," and expressed concern because he had never met him before. Dennis said that "Black" was one of his "dudes" that he brings in for extra jobs, and that he "wouldn't bring him to the table, otherwise he's one of my goons." Forster asked if they would be using Dennis, Roll, Johnson, and Black; and Dennis said he wanted to add 2 more to make sure all of his bases were covered. Forster asked if Dennis still wanted to kill the second agent, which had been Dennis's original plan, and Dennis reported that he felt better about it since he had a plan. Forster told Dennis he would get the rental vehicle on Monday for the deal on Wednesday, and the two agreed to make contact at a later time. Forster asked what Dennis was going to do with the "mess at this place when you guys are done," referring to dead bodies, and Dennis replied that "we already have

14

contingencies," laughed and said "it is what it is"… "I'm a Mormon, I go to church"… I got to go to work in the morning"… and "I don't wanna do this no more, this is the last time…we good, I can retire." The two agreed to speak at a later time.

15. On November 24, 2011, Dennis was arrested by the Billings Police Department on an outstanding warrant. Dennis has been continually incarcerated since that time.

16. On November 30, 2011, Johnson and a person named Rodrick Gant arrived at the tattoo parlor for what they understood to be a robbery of a drug courier at the tattoo parlor. Both Johnson and Gant showed Forster their firearms and affirmatively indicated they were ready to conduct the robbery of the drug courier at that time. Johnson and Gant were then arrested. Prior to Miranda warnings, Johnson spontaneously said that he and Dennis were planning to do a home invasion but that Dennis then was arrested. Johnson said that when the second deal came along, he wanted to participate so that he could get money to get Dennis out of jail and leave town.

17. On December 22, 2011, Dennis was charged by Indictment in CR-11-141 with, among other things, conspiring to commit a robbery affecting commerce. Doc. 1. Count I of the Indictment alleges:

That or about on period between April 1, 2011 and November 30, 2011, at Billings, in the State and District of Montana, the defendant, RICKY ALLEN DENNIS, and others known and unknown to the Grand Jury, knowingly agreed and conspired to commit the offense of robbery affecting commerce, in violation of 18 U.S.C. § 1951(a).

18. On October 10, 2012, after being thoroughly advised of all his rights, Dennis pleaded guilty to Counts II-IV in CR-11-141 and Counts I and II in CR-11-101. Dennis also acknowledged under oath that he was waiving his right to trial by jury on Count 1 in CR-11-141.

19. Dennis waived his right to trial by jury on Count I of CR-11-141 in writing on October 15, 2012. Doc. 27.

20. On October 12, 2012, the Government consented to Dennis's waiver of a jury trial. Doc. 26.

## III. CONCLUSIONS OF LAW

1. Based on Dennis's written waiver of the right to jury trial (doc. 27), his oral waiver under oath in open court, and the Government's consent to the waiver (doc. 26), the Court finds Dennis has knowingly, intelligently, and voluntarily waived his right to a jury trial on Count I of CR-11-141. Rule 23(a) Fed.R.Crim.P.; *United States v. Cochran,* 770 F.2d 850, 851 (9th Cir. 1980).

2. Title 18 U.S.C. § 1951(a) provides:

(a) Whoever in any way or degree obstructs, delays, or affects

16

commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

3. In order to convict Dennis of conspiracy to commit robbery affecting commerce under 18 U.S.C. § 1951(a), the United States must prove beyond a reasonable doubt that: (1) two or more people agreed to commit a robbery or extortion that in any way or degree obstructs, delays, or affects commerce; (2) the defendant had knowledge of the conspiratorial goal; and (3) the defendant voluntarily participated in trying to accomplish the conspiratorial goal. *United States v. Si*, 343 F.3d 1116, 1123-24 (2003).[1]

4. A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed

---

[1]The United States argues, without citation, that there are two elements to a Hobbs Act conspiracy: (1) an agreement between two or more persons to commit the offense of robbery affecting interstate commerce in violation of 18 U.S.C. § 1951(a), and (2) the defendant became a member of the conspiracy knowing at least one of his objects and intending to help accomplish it. Doc. 32, p. 3. These elements track the Ninth Circuit's Model Jury Instruction 8.20 for conspiracy. There is a slight difference between the three elements in *Si,* 343 F.3d at 1123-24, and those offered by the Government, the latter only requiring that the defendant intend to help accomplish the goals of the conspiracy, whereas the former requires the defendant to voluntary participate in trying to accomplish the conspiratorial goal. The *Si* elements are used here since that binding authority expressly provides the elements of a Hobbs Act conspiracy under 18 U.S.C. § 1951(a). In any event, Dennis' guilty is established beyond a reasonable doubt under either standard.

upon was committed. *Ninth Circuit Model Criminal Jury Instruction*, 8.20 (2010).

5. Unlike the crime of attempted robbery to affect commerce, to convict Dennis of conspiracy to commit robbery affecting commerce under 18 U.S.C. § 1951(a), the United States need not prove Dennis took a "substantial step" towards the commission of the crime. *See United States v. Nelson,* 66 F.3d 1036, 1044 (9th Cir. 1995) (attempt requires proof of substantial step in furtherance of the crime, whereas conspiracy requires proof of an overt act in furtherance of the conspiracy, the latter requiring less of an immediate connection to the crime than the substantial step necessary for attempt).

6. Since 28 U.S.C. § 1951(a) does not expressly require proof of an overt act, the Government need not prove any overt acts taken in furtherance of the conspiracy by any of its members. *See Whitfield v. United States*, 543 U.S. 209, 212-15 (2005) (if the statute creating the crime does not does not expressly make commission of an overt act an element of the conspiracy offense, the Government need not prove an overt act to obtain a conviction).

7. Findings of Fact ("FOF") ¶¶ 4-6 establish beyond a reasonable doubt that Dennis and at least one other agreed to commit a robbery of a cocaine courier and that Dennis was aware of the goal of the conspiracy. Specifically, Agent Forster told Dennis that he needed a crew to rob a cocaine courier at a stash house in

Billings, that only people who were serious about the robbery should be there, and Dennis agreed to bring some "niggers with crooked eyes." FOF, ¶¶ 4-6. Although Elkins would later be removed from the robbery crew by Dennis, FOF, ¶¶ 10, 13, Elkins agreed to participate when asked by Forster.  FOF, ¶ 5.The stipulated facts do not establish that Johnson verbally agreed to participate in the robbery at that time, but his agreement can be inferred from his presence at the meeting on November 16, 2011 when the crew met Forster's "boy", the second undercover agent posing as the alleged drug courier, FOF, ¶ 12, and the fact that he arrived to participate in the robbery on November 30, 2011. FOF, ¶ 16.

8. Additional evidence proving beyond a reasonable doubt that Dennis agreed to participate with others in a robbery of a cocaine courier and knew about the conspiratorial goal can be found in FOF, ¶¶ 7, 8, & 10, and especially in ¶ 12, which established that on November 16, 2011, Dennis met with Forster, Johnson, an unidentified man known as "Black," Anthony Roll, and the second undercover agent, to discuss the robbery. During that meeting, Dennis was emphatic that the guards be killed because "no witnesses, no case."  FOF, ¶ 12.

9. A conspiracy to steal cocaine from drug traffickers entails a sufficient showing of an effect on interstate commerce for purposes of establishing federal jurisdiction for a violation of 18 U.S.C. § 1951(a), even where the conspiracy

arises out of a federal law enforcement sting operation and neither the narcotics nor the narcotics traffickers actually exist. *United States v. Rodriguez,* 360 F.3d 949, 957 (9th Cir. 2003); *United States v. Williams,* 547 F.3d 1187, 1197 (9th Cir. 2008) (citing *Rodriguez* in "squarely rejecting" the argument that conspiring to rob fictitious drugs does not satisfy the interstate nexus for a Hobbs Act conspiracy). Accordingly, the United States has proven beyond a reasonable doubt that the robbery would have affected commerce.

10. As to the third element, there is ample evidence proving that Dennis voluntarily participated in trying to accomplish the conspiratorial goal. On November 8, Dennis met Forster at a cell phone store where Forster bought him a phone and added him to his plan so they could stay in contact. FOF, ¶¶ 6-7. At this same time, Dennis told Forster that he had recruited Anthony Roll to participate in the robbery, but that they needed a gun for Roll. FOF, ¶ 7. Further evidence that Dennis was recruiting crew members for the robbery is found in FOF, ¶¶ 8, 10, 12, & 14.

11. That Dennis voluntarily participated in trying to accomplish the robbery is also evidenced by his statement to the second undercover agent on November 16 that he wanted, and in fact needed, to participate in the robbery because he was "tired of selling dope, tired of selling sacks, tired of hustling, I'm old." FOF, ¶ 12.

12. Further evidence that Dennis knowingly and voluntarily agreed to participate in and accomplish the goals of the robbery is found in ¶ 13, where Dennis shows Forster the black mask he plans to use on the "special day," ¶ 14, where Dennis asks Forster for a layout of the robbery structure, talks about the type of vehicle he prefers for the robbery, tells Forster he is planning on having Roll, Johnson, Black in his crew, but that he would prefer to have two more, and that he plans for cleaning up the bodies after the robbery.

13. The fact that Dennis was arrested on November 24, 2011 on an outstanding warrant (¶ 15) and incarcerated when Johnson and Gant were arrested on November 30, 2011 is irrelevant to whether Dennis is guilty of conspiring to commit robbery affecting commerce because the crime of conspiracy was already complete.

## IV.  ORDER

For those reasons, Defendant Ricky Allen Dennis is adjudged guilty beyond a reasonable doubt of conspiracy to commit robbery affecting commerce, in violation of 18 U.S.C. § 1951(a), as charged in Count I of the Indictment in CR-11-141-BLG-RFC.

Sentencing in this matter is matter is set for **Thursday April 11, 2013 at 1:30 p.m.** together with sentencing in CR-11-101-BLG-RFC.  United States

Probation shall prepare a single presentence investigation report for both cases governed by the schedule set forth in this Court's December 12, 2012 Order in CR-11-101-BLG-RFC (doc. 27).

**SO ORDERED**.

Dated this 27th day of February, 2013.

*/s/ Richard F. Cebull*_____
Richard F. Cebull
United States District Judge